UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 3:16-CR-100 JD |
| | ) | |
| JOSEPH ANTONIO WILLIAMS | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Joseph Williams is charged with one count of possessing a firearm as a felon. He was arrested after an undercover officer reported to other officers that he believed a black male wearing a red hat was attempting to burglarize a home (located at 1208 Kentucky Street) by removing a window screen. Upon seeing a marked patrol unit approach the area, Mr. Williams fled on foot and refused to stop after commanded to do so by pursuing officers. Mr. Williams was eventually tased and brought to a halt. While officers attempted to secure Mr. Williams with handcuffs, they observed him reaching down toward his pants. Once arrested, a search of his person revealed a loaded firearm. At the scene, dispatch confirmed that Mr. Williams had active warrants for his arrest, after which, Mr. Williams was transported to the police station.

Mr. Williams has now moved to suppress the firearm's admission into evidence, arguing that no reasonable suspicion supported the officers' approaching him at 1208 Kentucky Street, and that, ultimately, his arrest and the pat down search were unlawful. For the following reasons, the Court denies the motion because the application of the attenuation doctrine precludes suppression. Moreover, even absent the application of that exception to the exclusionary rule, the officers acted lawfully.

### I. FACTUAL BACKGROUND

On the afternoon of October 6, 2016, officers from the Michigan City Police Department ("MCPD") setup an undercover drug transaction to take place at a corner store in Michigan City,

Indiana. MCPD Detective Al Bush, a thirty-nine year law enforcement veteran, was in charge of video-taping the encounter and verifying the safety of the confidential informant ("CI") given that the store was considered a violent location known for open drug dealing and shootings. During the controlled buy, the CI purchased $200 worth of cocaine from a black male known only to officers as "Eric," but referred to by them as "the target." After the drug deal took place, the officers did not intend to arrest Mr. Williams. Rather, Detective Bush continued to surveil the target in order to gain more information about him, including his identity.

As Detective Bush watched the target, he proceeded down an alley and through an empty lot that was adjacent to a home located at 1208 Kentucky Street. The target then approached the Kentucky Street home, where Detective Bush observed him grab a white plastic chair, place it underneath a window on the north side of the house, stand on the chair, and remove a screen from the window. Detective Bush then contacted his commander, Sergeant Ken Drake, to report what he thought was a burglary in progress by the target of the drug deal.

In response, Sergeant Drake of the MCPD Street Crimes Unit radioed for marked patrol cars to proceed to the Kentucky Street home. Once Sergeant Drake arrived near the home, he parked his unmarked vehicle just north of it, where he was able to see the target carrying a screen and setting it down. At one point, Detective Bush saw the target sit briefly on the front porch, but it was still unclear exactly what the target was doing. In response to the call out for a possible burglary in progress, MCPD Officer Kyle Shiparski proceeded toward the Kentucky Street home in his fully marked police SUV, but he overshot the location. Sergeant Drake observed the target look at Officer Shiparski's police cruiser and take off running.

MCPD Officer Michael Oberle spotted Mr. Williams running and exited his car to chase him. Despite Officer Oberle's verbal commands to stop for police (who intended to conduct an

investigative stop), the target continued to flee until Officer Oberle was able to tase him and bring him to the ground. Officer Shiparski, who had also started running after the target, arrived in time to assist with the arrest while catching the events on his bodycam.[1] As officers tried to place the target in handcuffs, Sergeant Drake, Officer Shiparski, and Officer Oberle observed him reaching for his waistband. Sergeant Drake instructed Officer Oberle to again deploy the taser, which then allowed the handcuffs to be placed on the target.[2]

When asked for identification, Mr. Williams told officers he didn't have any ID on him. When asked what his name was, officers learned for the first time that the target was actually the defendant, Mr. Joseph Williams. Mr. Williams was then advised that he was seen trying to break into a house, to which Mr. Williams responded that the Kentucky Street home belonged to his grandmother. Officer Shiparski immediately conducted a protective pat down search of Mr. Williams, which revealed a loaded 9mm Smith & Wesson handgun in his front left pants pocket—the same area that he had been reaching for when tased a second time. After bringing Mr. Williams to his feet, Officer Shiparski was able to locate Mr. Williams' driver's license in another pocket.[3]

Mr. Williams was then placed in a patrol car, while Officer Shiparski provided dispatch with Mr. Williams' name and date of birth in order to confirm his identity. Dispatch then

---

[1] The video from the bodycam was admitted into evidence during the evidentiary hearing and was reviewed by the Court in its entirety [Gov't Exb. 6].

[2] MCPD reports reflect the location of the arrest as 1208 Kentucky Street. However, the testimony at the hearing reveals that the target fled from the property and was arrested near 11th and Tennessee Streets. Thus, the Court finds that on October 6, 2016, no officer entered the property at 1208 Kentucky Street prior to the target's arrest.

[3] The driver's license listed an address of 1208 Kentucky Street.

3

informed the officers that Mr. Williams had three outstanding warrants[4] for his arrest (for an escape, probation violation, and criminal mischief).[5] Thereafter, Mr. Williams was taken to the MCPD where he was ultimately charged with resisting law enforcement and being a serious violent felon in possession of a handgun.

That same day, Sergeant Drake went to the Kentucky Street home and interviewed Mr. Williams' grandmother, Bernice Williams. According to Sergeant Drake, Bernice Williams denied that the defendant lived with her, but she had asked him to fix the window screens earlier that day. At the evidentiary hearing, Mr. Williams' mother explained that the defendant was essentially reared in the Kentucky Street home because she was young and needed her parents' assistance with raising him but did not go so far as to indicate he was living there at the time. Thus, while it may be that the 1208 Kentucky Street home was the residence of Mr. Williams at some time, the Court finds credible the MCPD officers' testimony indicating that at the time of the arrest, no officer knew the identity of Mr. Williams, nor did any officer associate Mr. Williams with being a resident of the Kentucky Street house (despite having prior dealings with Mr. Williams at the same home several years prior to the incident in question).[6]

---

[4] The testimony of Sergeant Drake and Officer Shiparski established that they became aware of Mr. Williams' active arrest warrants while on the scene and very shortly after placing Mr. Williams in handcuffs and locating the firearm.

[5] Although Mr. Williams argues that the warrants were marked with "received time[s]" of 19:01:59, 19:02:26, and 19:02:27 of 10-6-16 [Def's Exb. 4 at 5], it appears that these time stamps represented when the warrants were printed at the MCPD after Mr. Williams' arrest. Sergeant Drake's police report corroborates that the warrants were confirmed upon arrival at the MCPD [Def's Exb. 4 at 8].

[6] Mr. Williams contends that the MCPD report detailing the October 6, 2016 drug buy and listing 1208 Kentucky Street as his address [DE 36-1], suggests that the officers had prior knowledge of where Mr. Williams lived. But this report was not created until after Mr. Williams was apprehended.

After being indicted as a felon in possession of a firearm, Mr. Williams moved to suppress admission of the firearm into evidence.

## II. DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A warrantless search is per se unreasonable under the Fourth Amendment unless one of a few well-established exceptions applies. *Arizona v. Gant*, 556 U.S. 332, 129 (2009); *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009). Three of these exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence. *Utah v. Strieff*, 136 S.Ct. 2056, 2061 (2016). Those exceptions are known as the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. *Id*. Relative to the attenuation doctrine, it allows for the admission of evidence obtained unlawfully when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Id*. (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)); *see also Nevada v. Torres*, 136 S.Ct. 2505 (2016) (granting the petition for writ of certiorari in light of *Strieff* and vacating holding that without reasonable suspicion, the discovery of arrest warrants could not purge the taint from an illegal seizure and search incident to arrest revealing a firearm). Under that doctrine, the Supreme Court has held that a valid arrest warrant precludes the suppression of evidence seized in an arrest, even if the arrest was set in motion by officers who had neither probable cause nor knowledge of the warrant. *Strieff*, 136 S.Ct. at 2063-64; *United States v. Patrick*, 842 F.3d 540, 542 (7th Cir. 2016) ("*Strieff* tells us that, if the police had stopped Patrick's car for no reason at all and learned only later that he was a wanted man, the gun would have been admissible in evidence.").

Assuming for now that the MCPD officers' initial stop of Mr. Williams was unlawful (whether considering the anticipated *Terry* stop near the Kentucky Street home (a concern raised by Mr. Williams), or the point at which Mr. Williams was actually tased and cuffed (the other concern raised by Mr. Williams)), the Court is confronted with the same issue that was addressed in *Strieff*. That is, whether the discovery of a valid arrest warrant is a sufficient intervening event to break the causal chain between the unlawful stop and the discovery of the firearm on Mr. William's person. In making that determination, the Court must look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search, "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Strieff*, 136 S.Ct. at 2062 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

Here, the temporal proximity between the unlawful stop and search, favors suppressing the evidence. Not only did "substantial time" not elapse between the stop and the firearm's discovery, *see id*. (citation omitted), but the bodycam recording reveals that less than five minutes passed from the time that Mr. Williams fled his grandmother's property until officers located the gun. And even less time passed between his being tased and searched. As the Supreme Court explained in *Brown* and reiterated in *Strieff*, such a short time interval counsels in favor of suppression. *Strieff*, 136 S.Ct. at 2062 (relying on *Brown*, 422 U.S. at 604) (finding that the confession should be suppressed where "less than two hours" separated the unconstitutional arrest and the confession).

As to the second factor, the presence of intervening circumstances favors the government. In this case, Mr. Williams had three outstanding arrest warrants, the validity of which has not been legitimately contested. Moreover, those warrants were wholly unrelated to the events that

6

occurred on October 6, 2016. In fact, at least one of the arrest warrants was issued in June 2016, after Mr. Williams allegedly failed to return to work release as a condition of his parole for a robbery he committed in 2013. Thus, it is uncontested that the valid warrant predated the October 2016 investigation involving Mr. Williams, and those warrants were entirely unconnected with the stop. Accordingly, the discovery of the warrants for Mr. Williams' arrest created sufficient attenuation under *Strieff*.

Mr. Williams attempts to differentiate *Strieff* [DE 31 at 11-12], because in *Strieff* the warrant's existence became known to officers after illegally stopping Strieff but prior to Strieff's arrest and search incident to arrest.[7] Such a distinction in the causal chain was discussed by Chief Judge Diane Wood of the Seventh Circuit in *United States v. Patrick*, 842 F.3d 540, 550 (7th Cir. 2016) (Wood, C.J., dissenting) ("The arrest warrant here (and the relevant officers' awareness of it) preceded both the potentially illegal action and the potentially valid search—it was "upstream" of both . . . The arrest warrant is therefore not an intervening cause, at least in the temporal sense."). However, it does not appear that *Strieff* or the Seventh Circuit's majority opinion in *Patrick* draw such a distinction in precluding the suppression of evidence. Even Chief Judge Wood recognizes in her dissent that *Strieff* contains language that could be stretched to suggest that a warrant's existence, regardless of the actual casual chain, is sufficient attenuation. *See id*. Additionally, the circumstances of this case reveal that the officers would have inevitably discovered the loaded firearm as part of a search before taking Mr. Williams into custody, once

---

[7] Mr. Williams also contends that Strieff consented to the officer's inquiry, but this can't be the case since the Supreme Court assumed the illegality of the stop. *Strieff*, 136 S.Ct. at 2060 ("We granted certiorari to resolve disagreement about how the attenuation doctrine applies where an unconstitutional detention leads to the discovery of a valid arrest warrant.").

7

they found his driver's license (which Mr. Williams denied having) and confirmed his identity and pending arrest warrants with dispatch. *See, e.g., Atkins v. City of Chicago*, 631 F.3d 823, 827 (7th Cir. 2011) (noting that the arrest was based on a valid warrant rather than on anything turned up in the illegal search). In other words, the officers would have discovered that Mr. Williams was a fugitive, arrested him on the active warrants, and conducted a lawful search incident to arrest, *Chimel v. California,* 395 U.S. 752 (1969), thereby resulting in the firearm's discovery independent of the initial reason for the stop. *See McDaniel v. Polley*, 847 F.3d 887, 895 (7th Cir. 2017) (noting that had the officers not put the defendant in handcuffs briefly and waited minutes to put him in the police car, they would have had probable cause for the arrest based on the officer's identification of the defendant independent of the arrest).

There remains additional intervening circumstances not present in *Strieff* that command against suppression here. When officers approached the area in their units Mr. Williams fled the property upon seeing the police, refused to stop when commanded to do so by Officer Oberle, and resisted being placed in handcuffs while reaching toward his loaded gun. He then lied about not having identification on his person. At this point, Mr. Williams' resistance to even an initially illegal arrest provided independent grounds for his legitimate arrest under Indiana Code 35–44.1–3–1. *See United States v. Shepherd*, 160 F. App'x 489, 491–92 (7th Cir. 2005) (noting that even if the officers did not have probable cause to initiate the warrantless arrest, they had probable cause to believe that the defendant, at minimum, had resisted law enforcement; therefore it was proper to deny the motion to suppress the weapon discovered in a search incident to the warrantless arrest) (citing *State v. Moriarity*, 832 N.E.2d 555, 558 (Ind. Ct. App. 2005) (explaining that citizens may not forcefully resist a peaceful arrest by persons known to be police officers, even if the arrest is unlawful); *Robinson v. Indiana*, 814 N.E.2d 704, 708 (Ind. Ct. App.

2004) (same)); *see also Henning v. O'Leary*, 477 F.3d 492, 495 (7th Cir. 2007) (noting in dicta that even if a "stop and search were illegal," the arrestee "had no right to resist the officers' attempts to arrest him."). In short, Mr. Williams' resisting arrest was a sufficient intervening event to break the causal chain between the presumed unlawful stop and the discovery of the gun on his person. *See United States v. Green*, 111 F.3d 515, 522 (7th Cir. 1997) (citing *United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995) (holding that assuming arguendo the "initial stop and arrest of Dawdy were invalid, Dawdy's resistance provided independent grounds for his arrest, and the evidence discovered in the subsequent searches of his person and his automobile is admissible.")).

Finally, the third factor the Court must consider is the purpose and flagrancy of the official misconduct, *see Strieff*, 136 S.Ct. at 2063, which in this case strongly favors the government. It has been held that the flagrancy of police misconduct is the most important element of the analysis because the exclusionary rule is aimed at deterring police misconduct. *McDaniel*, 847 F.3d at 896 (citations omitted). "The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 136 S.Ct. at 2063. When an officer's conduct is negligent but not flagrant or purposeful, the exclusionary rule's objective is not served and strongly favors admissibility. *Id*. Good-faith mistakes, resulting from errors in judgment, "hardly rise to a purposeful or flagrant violation of . . . Fourth Amendment rights." *Id*.

In *Strieff*, an officer stopped Strieff leaving a suspected drug house without reasonable suspicion of wrongdoing. The Court said that the officer violated Strieff's Fourth Amendment rights and instead should have asked Strieff to talk instead of demanding that he do so. Notwithstanding the Fourth Amendment violation, the Court concluded that the third prong of

9

the *Brown* test was not satisfied because the officer made a good-faith mistake and did not act purposefully or flagrantly. *Strieff*, 136 S.Ct. at 2063.

That same rationale applies here, but with more force. In this case, officers actually had probable cause to arrest Mr. Williams based on his providing drugs to the CI during a controlled purchase in a high crime area. However, the officers didn't intend to arrest Mr. Williams at that time for fear of blowing their CI's cover and because they wanted to gather more information on their target. But once Detective Bush observed what he believed was a burglary in progress by the target, he alerted the other MCPD officers of this fact. At this point, no officer knew the identity of the target, nor did they associate him as being a resident of the Kentucky Street home. Thus, the officers clearly had at least a reasonable suspicion to conduct a *Terry* stop based on their belief that Mr. Williams was attempting to burglarize the home. *See United States v. Snow*, 656 F.3d 498, 503 (7th Cir. 2011) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). In other words, only by investigating the circumstances further, and in particular by questioning Mr. Williams, could the police determine whether in fact a burglary was being attempted—that is, after all, the very purpose of a *Terry* stop. *See id*. Ultimately, had Mr. Williams not fled the property once marked units approached the Kentucky Street home, then officers could have done exactly what the *Strieff* Court criticized the officers for not doing—that is, ask to speak with the suspect. So while the MCPD officers were ultimately mistaken in their belief that Mr. Williams was breaking into the home, this error in judgment hardly rises to a purposeful or flagrant violation of Mr. Williams' Fourth Amendment rights.

Additionally, Mr. Williams' unprovoked flight from the property before police could question him aroused the officers' suspicions. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily

10

indicative of wrongdoing, but it is certainly suggestive of such."). Thus, the Court concludes that the MCPD officers were justified in suspecting that Mr. Williams was involved in criminal activity, and, therefore, justified in investigating further. This ability to investigate included their ability to lawfully stop him once he took flight after observing the patrol car. *See id.*; *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (noting that whether the suspect walked away for a few seconds before running away from officers is a difference without a constitutional distinction). And once Mr. Williams was tased and halted by the ensuing officers, they were then free to conduct a "protective pat-down search" given that they had at a minimum some articulable suspicion that Mr. Williams was reaching for a weapon and posed a danger to the officers or others. *See Gentry v. Sevier*, 597 F.3d 838, 847 (7th Cir. 2010). Moreover, running the warrant check was a "negligibly burdensome precaution[n]" for officer safety. *Strieff*, 136 S.Ct. at 2063 (citation omitted). Ultimately, no evidence in this case suggests that there is any systemic or recurrent police misconduct on the part of the MCPD.[8]

In sum, the quickly evolving series of events involved in this case demonstrate that the officers' conduct was not flagrant or purposeful, and thus, application of the exclusionary rule is not warranted. *See United States v. Chagoya-Morales*, 859 F.3d 411, 417 (7th Cir. 2017) (noting that the exclusionary applies only where its deterrence benefits outweigh its substantial social costs). That, in addition to the intervening events described herein, attenuated the discovery of the firearm from any unlawful conduct.

---

[8] The Court also rejects Mr. Williams' *pro se* argument that the officers engaged in flagrant misconduct by providing affidavits containing falsehoods and omitting material information, under *Franks v. Delaware*, 438 U.S. 154 (1978). While evidence will be suppressed if officers procure a warrant with false information, *see id.*, this case did not involve the securing of any warrants by MCPD officers based on the events of October 16, 2006.

Up until now, the Court has assumed for purposes of discussing the attenuation doctrine that the initial encounter with Mr. Williams was unlawful. But the above discussion reveals that these officers had a reasonable basis to conduct a *Terry* stop. *See supra*. Moreover, once Mr. Williams fled upon seeing the patrol car, refused audible officer commands to stop, and reached for his waistband in resisting placement of the handcuffs on this wrists, officers acted lawfully in arresting him and searching his person, thereby locating the firearm. *See supra*. As such, application of the attenuation doctrine would be unnecessary.

### III.  CONCLUSION

For those reasons, the Court DENIES the motion to suppress [DE 30].

SO ORDERED.

ENTERED:   August 22, 2017

      /s/ JON E. DEGUILIO
Judge
United States District Court